IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA15-1257

Filed: 20 September 2016

Watauga County, No. 14 CVS 416

DALE THOMAS WINKLER and DJ'S HEATING SERVICE, Petitioners,

v.

STATE BOARD OF EXAMINERS OF PUMBLING, HEATING AND FIRE SPRINKLERS CONTRACTORS, Respondent.

Appeal by petitioners from order entered 22 June 2015 by Judge Jeff Hunt in Watauga County Superior Court. Heard in the Court of Appeals 12 April 2016.

*Bailey & Dixon, L.L.P., by Jeffrey P. Gray, for petitioners-appellants.*

*Young Moore & Henderson, P.A., by Angela Farag Craddock, John N. Fountain, and Reed N. Fountain, for respondent-appellee.*

STROUD, Judge.

Petitioners Dale Thomas Winkler and DJ's Hearing Service ("Winkler"[1]) appeal from the trial court's order affirming respondent State Board of Examiners of Plumbing, Heating, and Fire Sprinklers Contractors (the "Board")'s order revoking Winkler's license. This case arises out of a series of failures by many different people to prevent or discover the source of a deadly leak of carbon monoxide into a hotel room

---

[1] Although Mr. Winkler appeals in both his individual capacity and through his business, DJ's Heating Service, for ease of reading, we refer to petitioners simply as "Winkler" throughout this opinion.

at a Best Western Hotel in Boone, North Carolina, until after three people had died and one was injured by the carbon monoxide leak. But the question presented to this Court is not who is responsible for these tragedies. Our question is simply whether the Board had jurisdiction and authority to impose disciplinary action upon Winkler for the work he performed at the hotel. Based upon the applicable statutes and regulations, we find that the Board did not have jurisdiction over Winkler's inspection of the pool heater and exhaust system, although it did have jurisdiction over the later planned installation of an HVAC system in another part of the hotel. Because the discipline imposed was tailored to address the pool heater issue instead of the HVAC installation issue, we reverse and remand for entry of a new order with sanctions based solely upon Winkler's planned installation of an HVAC system which was not within his license.

I. Background

The basic facts regarding the relevant events at the Best Western Hotel in Boone are not in dispute. The hotel was managed by Appalachian Hospitality Management (the "hotel management"). Sometime in 2011, the hotel maintenance staff "replaced a propane gas pool heater with a used propane gas pool heater" which had previously been used "at another hotel managed by Appalachian Hospitality Management." In February 2012, the replacement propane pool heater "was converted from propane gas to natural gas [by] Independence Oil and Gas." The

converted heater was permitted and inspected by "the local Authority Having Jurisdiction," the Town of Boone. The pool heater was in "an equipment room adjacent to the pool."

Over a year after the conversion of the heater to propane gas, the hotel maintenance staff was concerned the pool heater was "not functioning or the pilot light would not light." On or about 13 April 2013, the hotel management's maintenance staff asked Winkler, who was operating his business at the time as DJ's Heating Service, "to examine the pool heater and get it running." Mr. Winkler was licensed by the Board of Examiners of Plumbing, Heating and Fire Sprinkler Contractors with a "Heating Group 3 Class II (H-3-II)" license which is "limited to HVAC work on detached residential structures." The Board also issues a different level of license, H-3-I, which covers "all H-3 systems regardless of location unless the combined systems at the site exceed 15 tons." Mr. Winkler's employment history and experience before going into business as DJ's Heating Service included service and installation of HVAC systems. He had also been employed "by a propane gas company where he was actively involved in service on gas lines and setting tanks for propane fuel." Some members of the maintenance staff at the hotel knew Mr. Winkler because he had done some work on their residential properties.

Exactly what Mr. Winkler was asked to do, and what he did, on 13 April 2013 is crucial to the determination of jurisdiction in this case, so we will focus on these facts. The Board found as follows:

> 10. On or about April 13, 2013, [Winkler] examined the heater, and found that the gas supply had been cut off. Along with the Best Western Motel maintenance staff, [Winkler] cut the fuel on, and put the pool heater in operation. [Winkler] did not examine or inspect the exhaust or venting system for the pool heater at that time, and was not asked to do so.

In his testimony before the Board, Mr. Winkler described what he did that day as follows:

> [T]he only thing we done was [sic] broke the union loose. Verified the unit did not have any gas. Let maintenance know that. They went searching for the reason, being they are the ones that said gas was turned off in the ceiling. They turned the gas back on. We verified the pool heater had gas. Checked for leak. They lit the pool heater back. We left.

Testimony of various hotel employees was consistent with Mr. Winkler's description of what he did that day. Thus, in short, the pool heater was not working because the gas was not turned on; they turned the gas back on and relit the pool heater. It is not entirely clear from either the evidence or findings whether Mr. Winkler personally turned the gas to the heater back on or the hotel maintenance staff did, but either way, no physical change was made to the pool heater other than turning the gas back on and lighting the heater. No parts were removed or installed.

No one knew why the gas had been cut off. The hotel maintenance staff did not ask Mr. Winkler to "examine or inspect the exhaust or venting system" that day and he did not do so.

Three days later, two people died in Room 225, which was "above the pool equipment room."

> 11. On April 16, 2013, Daryl Jenkins and Shirley Jenkins rented Room 225 at the Best Western Motel, which room was located above the pool equipment room where the pool heater was located.
>
> 12. On April 16, 2013, Daryl Jenkins and Shirley Jenkins died in Room 225. Autopsies were performed on Daryl Jenkins and Shirley Jenkins shortly thereafter and blood samples were submitted for a toxicology report.

Carbon monoxide poisoning was not immediately identified -- or even suspected -- when Mr. and Mrs. Jenkins died, by either the emergency medical personnel who responded or by the fire department for the Town of Boone, which assisted on the call, or by the hotel maintenance staff, or by the police department. Despite the simultaneous deaths of the husband and wife, everyone involved believed the deaths to be from "natural causes." But apparently the possibility of a gas leak may have occurred to the hotel owner, Mr. Mallatere, because he closed the room and asked that the gas fireplace in Room 225 be checked.

About three or four days after the Jenkins' deaths in Room 225, the hotel maintenance staff again called Mr. Winkler, this time to check for gas leaks to the

fireplace in the room; he found none. After this, Mr. Malaterre asked the maintenance staff to have Mr. Winkler come back to the hotel again to check the venting from the pool heater. Mr. Winkler came a few days later to check the exhaust from the pool heater, and he and the hotel maintenance manager confirmed that it was venting. Mr. Winkler also advised the hotel maintenance staff that he did not have equipment to check for carbon monoxide leaks but gave them the name of a company which would have the proper equipment to do carbon monoxide testing. No one called that company to have the room checked for carbon monoxide.

Room 225 remained closed for several more weeks, until 31 May 2013, not because of any problem with the room, but "just out of respect" due to the death of Mr. and Mrs. Jenkins there, according to the assistant general manager. The next day, on 1 June 2013, the toxicology report for the Jenkins was completed and "[a] lethal concentration of carbon monoxide" was found in their blood. But the results of the toxicology tests were not immediately provided to the hotel maintenance staff or the Board.

Still unaware of the results of the Jenkins' toxicology test results, on 8 June 2013, the hotel rented Room 225. Jeffrey Williams, a minor, and his mother stayed there. Jeffrey died and his mother was injured. When the fire department responded to this second call for a death in Room 225, they "immediately called for a rescue truck which carried [the carbon monoxide] monitoring equipment at the time, and . .

. that's when we got some positive hits on the monitor." Due to the positive carbon monoxide readings, the fire department "isolated a much larger area than what we had, and called for one of the Hazmat teams" from Asheville, and "secured the building overnight." At this point, a variety of inspectors descended upon the hotel building, doing many tests and inspections and ultimately determining that carbon monoxide was coming from the pool heater into Room 225. Carbon monoxide was leaking from the pool heater in the equipment room, up through the wall into Room 225 above, and was venting from the pipe that ended on the outer wall of the hotel just below the intake for the air conditioner for Room 225. Toxicology reports regarding Jeffrey and his mother confirmed that "[e]xcessive amounts of carbon monoxide were found in their blood."

Unrelated to the pool heater issues, during the period from 4 June 2013 to 7 June 2013, the hotel maintenance staff also called Mr. Winkler "regarding the HVAC systems servicing the breakfast area, the lobby area and the laundry room" because they "were not operating properly." Mr. Winkler determined that "one system needed a relay, another needed a blower or fan motor and a third needed replacement." The hotel ordered the parts, and Mr. Winkler was to "install or repair the systems when the equipment arrived." After installing the new equipment, the breakfast area system still did not work, so a "complete replacement was then ordered. The new

equipment arrived, addressed to [Winkler] at the Best Western, on June 7, 2013."

Mr. Winkler was to install the new equipment, but

> Upon his arrival at the Best Western on June 8, 2013, . . . Winkler observed the yellow tape placed around the scene by the police. [Winkler] then informed the maintenance staff that he (Winkler) should not be present, and stated that he had previously told hotel staff he did not have a commercial license. The maintenance staff denied [Winkler] made such prior statement."

The Board noted that Winkler's license did not qualify him to "contract, install or replace HVAC installations at the Best Western Motel" because it is "not a single family residential structure" and "[t]he aggregate tonnage" of the equipment at the hotel "was far in excess of the 15 ton limitation of any H-3 license, let alone an H-3-II license."

The investigations of the source of the carbon monoxide in Room 225 that followed the third death in the room found an egregious series of errors, going all the way back to the initial installation of the pool heater in 2011. The Board's order in this case identified the following deficiencies, listed here in roughly chronological order:

1. The manufacturer of the replacement pool heater installed by the hotel maintenance staff in 2011 "specified that the equipment not be converted from propane to natural gas."

2. Room 225 had a "combustible gas detector and alarm which had been located near the floor as appropriate for a facility using propane. An occupied structure using natural gas should locate such devices near the ceiling, as natural gas is lighter than air. This device would not detect CO in either location."

3. The pool heater was a "natural draft appliance" which is "required to be vented or exhausted either by a flue extending higher than the roof, or by the use of a forced draft system or power venter."

4. "The non-functioning power venter was rated at approximately 75000 BTU capacity while the pool heater which had been substituted at the Best Western had a capacity of 250,000 BTU's as reflected on the equipment label. Even when functioning, such a power venter was unlikely to exhaust all the harmful gasses."

5. The pool equipment room where the pool heater was located "also contained standard pool chemicals, which . . . were highly corrosive to metal, such as the venting pipes from the pool heater to the exterior of the building, and corrosive air and gasses were being drawn into and through the pool heater and exhaust flue. Evidence of corrosion was visible without the use of any equipment."

6. "In plain sight near the pool heater were a group of wires hanging in the air not connected to the pool heater but terminated with wire nuts. The wires were intended to supply power for a power venter which had been disconnected, likely well before [Winkler's] arrival."

7. "[T]he pool heater was utilizing a side wall to connect the vent pipe to the exterior of the Motel but no power venter was functioning; in addition, the rise of the slope of the flue pipe did not comply with the State Mechanical Code."

8. Despite the improper conversion from propane to natural gas and other deficiencies, including its location in the equipment room and lack of proper venting, the replacement pool heater was permitted and passed inspection by the Town of Boone.

9. Someone "had installed or altered penetrations of the fire-rated walls without adequate firestopping, eventually allowing products of combustion to travel into and through a stud cavity and enter room 225."

10. "[T]he vent pipe for the pool heater had multiple holes in both the double wall and the improperly used single wall vent pipe as a result of extensive corrosion." This corrosion had "developed and existed over a substantial period of time."

On or about 24 January 2014, the Board filed a Notice of Hearing instituting disciplinary action against Winkler, alleging violations of N.C. Gen. Stat. § 87-23(a) arising out of Mr. Winkler's "service call[s]" to the hotel (1) on or about 13 April 2013 regarding the pool heater; (2) in "late April or early May" 2013 regarding venting of the pool heater; and (3) from 4 June 2013 to 7 June 2013 regarding the HVAC system in the breakfast area. On or about 9 May 2014, Winkler moved to dismiss the Notice of Hearing, alleging that the Board did not have jurisdiction over his actions arising out of the inspection or evaluation of the pool heater because "[t]he Board's enabling statute, Article 2 of the Chapter 87 of the General Statutes, only contemplates 'installation,' or possibly an intent to install, such as contracting to install without a license of [sic] the appropriate license."

On 13 May 2014, the Board held a hearing "to determine whether to revoke or suspend the license of [Winkler] on grounds of violation of G.S. 87-23(a) which provides that the Board may revoke or suspend the license of any plumbing, heating or fire sprinkler contractor who fails to comply with any provision or requirement of Chapter 87, Article 2, or for gross negligence, incompetence, or misconduct in the practice of or in carrying on the business of either a plumbing, heating or fire sprinkler contractor[.]" The Board issued its order on 10 June 2014, denying Winkler's motion to dismiss and imposing various sanctions upon Winkler, including suspension of his license for one year and imposing requirements during that year to

"enroll in, attend and complete" several "courses intended to remedy the deficiencies in knowledge revealed by this order," as well as other requirements. Winkler's failure to complete all of the courses and other requirements would result in permanent revocation of his license.

On 25 July 2014, Winkler filed a petition for judicial review and stay of decision and order with the Superior Court of Watauga County, for review under N.C. Gen. Stat. § 150B-43 *et seq.* and N.C. Gen. Stat. § 87-23(a). The superior court stayed the Board's order pending review. Winkler's appeal was heard on 20 April 2015, and the superior court entered its order affirming the Board's decision on 22 June 2015. In the order, the court noted that its standard of review was "dictated by the issues presented[,]" citing *Mann Media, Inc. v. Randolph Cty. Planning Bd.*, 356 N.C. 1, 12, 565 S.E.2d 9, 17 (2002). The superior court engaged in *de novo* review of whether the Board violated "subsections G.S. 150B-51(b)(1), (2), (3), or (4) of the APA," and "[w]here the substance of the alleged error implicates subsection 150B-51(b)(5) or (6), the reviewing court applies the "whole record test.' " *N.C. Dep't of Env't & Natural Res. v. Carroll*, 358 N.C. 649, 659, 599 S.E.2d 888, 895 (2004) (citation omitted). The order concluded that upon whole record review of "each Finding of Fact contained in the Order entered by the Board," "each Finding of Fact is supported by substantial evidence contained in the Record" and that the Board's "Conclusions of Law are supported by the Finding[s] of Fact[.]" The court also addressed Winkler's motion to

dismiss for lack of jurisdiction under N.C. Gen. Stat. § 87-21, and using *de novo*

review, concluded that

> the acts and omissions of [Winkler] fell within the
> statutory authority of the Board to regulate and discipline
> [Winkler]. The Court also notes [Winkler was] involved in
> activities beyond simply the acts and omissions relating to
> the pool heater.

The superior court thus denied Winkler's motion to dismiss for lack of

jurisdiction, affirmed the Board's order, and dissolved the stay issued during the

pendency of the appeal. On 1 July 2015, Winkler gave notice of appeal from the order.

The trial court granted Winkler's motion for stay of the Board's decision and order

pending review by this Court.

II.  Standard of Review

The standard of review on appeal to this Court depends upon the issue

presented.

> On judicial review of an administrative agency's
> final decision, the substantive nature of each assignment
> of error dictates the standard of review. Reversal or
> modification of the agency's final decision is permitted only
> when the reviewing court determines a petitioner's
> substantial rights may have been prejudiced as a result of
> the agency's findings, inferences, conclusions, or decisions
> being:
>
> (1)  In violation of constitutional provisions;
> (2)  In excess of the statutory authority or
> jurisdiction of the agency;
> (3)  Made upon unlawful procedure;

> (4)  Affected by other error of law;
> (5)  Unsupported by substantial evidence admissible . . . in view of the entire record as submitted; or
> (6)  Arbitrary or capricious, or an abuse of discretion.
>
> The first four grounds are "law-based" inquiries warranting *de novo* review.  The latter two grounds are "fact-based" inquiries warranting review under the whole-record test.  Under *de novo* review, a court considers the matter anew and freely substitutes its own judgment for the agency's.  Under the whole-record test, a court examines all the record evidence -- that which detracts from the agency's findings and conclusions as well as that which tends to support them -- to determine whether there is substantial evidence to justify the agency's decision. Substantial evidence is relevant evidence a reasonable mind might accept as adequate to support a conclusion.

*Trayford v. N.C. Psychology Bd.*, 174 N.C. App. 118, 120-21, 619 S.E.2d 862, 863-64 (2005), *aff'd per curiam*, 360 N.C. 396, 627 S.E.2d 462 (2006) (citations, quotation marks, and brackets omitted).

III.  Disciplinary Jurisdiction

Winkler's first argument on appeal is that "[t]he trial court erred as a matter of law by rejecting the N.C. Supreme Court's opinion in [*Elliott v. N.C. Psychology Bd.*, 348 N.C. 230, 498 S.E.2d 616 (1998),] and thereby concluding the Board was not in excess of its statutory authority and jurisdiction and its action was not based on unlawful procedure."  Winkler contends that "the Board lacks jurisdiction over the activity of a licensee that does not amount to an 'installation,' and was a mere

inspection, evaluation or equipment check." Winkler challenges the Board's jurisdiction under N.C. Gen. Stat. Chapter 87, Article 2 as a matter of law. Because this argument presents a legal question, we review it *de novo*. *Trayford*, 174 N.C. App. at 121, 619 S.E.2d at 864. For purposes of this argument, we will assume that the Board's findings of fact were supported by substantial evidence.

Winkler's jurisdictional argument is based primarily upon the enabling statutes of the Board in Chapter 87, Article 2, of the North Carolina General Statutes. Specifically, N.C. Gen. Stat. § 87-21(a)(5) (2015) defines those who "shall be deemed and held to be engaged in the business of plumbing, heating, or fire sprinkler contracting" as follows:

> (5) Any person, firm or corporation, who for a valuable consideration, (i*) installs, alters or restores, or offers to install, alter or restore*, either plumbing, heating group number one, or heating group number two, or heating group number three, or (ii) lays out, fabricates, installs, alters or restores, or offers to lay out, fabricate, install, alter or restore fire sprinklers, or any combination thereof, as defined in this Article, *shall be deemed and held to be engaged in the business of plumbing, heating, or fire sprinkler contracting;* provided, however, that nothing herein shall be deemed to restrict the practice of qualified registered professional engineers. Any person who installs a plumbing, heating, or fire sprinkler system on property which at the time of installation was intended for sale or to be used primarily for rental is deemed to be engaged in the business of plumbing, heating, or fire sprinkler contracting without regard to receipt of consideration, unless exempted elsewhere in this Article.

*Id.* (Emphasis added).

Winkler holds a Class II license under N.C. Gen. Stat. § 87-21(b)(1) (2015), which covers "plumbing and heating systems in single-family detached residential dwellings." North Carolina General Statute § 87-23 (2015) sets forth the Board's authority to "revoke or suspend" a license or to "order the reprimand or probation of" a licensed contractor:

> (a) The Board shall have power to revoke or suspend the license of or order the reprimand or probation of any plumbing, heating, or fire sprinkler contractor, or any combination thereof, who is guilty of any fraud or deceit in obtaining or renewing a license, or who fails to comply with any provision or requirement of this Article, or the rules adopted by the Board, or *for gross negligence, incompetency, or misconduct, in the practice of or in carrying on the business of a plumbing, heating, or fire sprinkler contractor,* or any combination thereof, as defined in this Article. Any person may prefer charges of such fraud, deceit, gross negligence, incompetency, misconduct, or failure to comply with any provision or requirement of this Article, or the rules of the Board, against any plumbing, heating, or fire sprinkler contractor, or any combination thereof, who is licensed under the provisions of this Article. All of the charges shall be in writing and investigated by the Board. Any proceedings on the charges shall be carried out by the Board in accordance with the provisions of Chapter 150B of the General Statutes.

N.C. Gen. Stat. § 87-23(a) (emphasis added).

But N.C. Gen. Stat. § 87-21(c) (2015) exempts certain acts from "[t]he provisions" of Article 2 of Chapter 87:

> (c) **To Whom Article Applies.** -- The provisions of this Article shall apply to all persons, firms, or corporations who engage in, or attempt to engage in, the business of plumbing, heating, or fire sprinkler contracting, or any combination thereof as defined in this Article. *The provisions of this Article shall not apply to those who make minor repairs or minor replacements to an already installed system of plumbing, heating or air conditioning, but shall apply to those who make repairs, replacements, or modifications to an already installed fire sprinkler system. Minor repairs or minor replacements within the meaning of this subsection shall include the replacement of parts in an installed system which do not require any change in energy source, fuel type, or routing or sizing of venting or piping. Parts shall include a compressor, coil, contactor, motor, or capacitor.*

*Id.* (emphasis added).

The Board has also adopted regulations, by its authority under Chapter 87, which exclude certain repairs or alterations to an existing system from the ambit of "minor repairs" within the meaning of N.C. Gen. Stat. § 87-21(c). Specifically, any "connection, repair or alteration which if poorly performed creates a risk" of carbon monoxide exposure is not a "minor repair" or "alteration":

> .0506 MINOR REPAIRS AND ALTERATIONS.
> (e) Any connection, repair or alteration which if poorly performed creates risk of fire or exposure to carbon monoxide, open sewage or other gases is not a minor repair, replacement or alteration.
>
> (f) The failure to enumerate above any specific type of repair, replacement or alteration shall not be construed in itself to render said repair, replacement or alteration as minor within the meaning of G.S. 87-21(c).

21 N.C. Admin. Code 50.0506(e)-(f) (2016).

In addition, the regulations include the following relevant "Guidelines on

Disciplinary Actions":

> (a) The provisions of G.S. 87, Article 2, the rules of the Board and the matters referenced therein are the guidelines by which the conduct of an entity subject to the authority of the Board are evaluated.
> . . . .
>
> (f) The Board may revoke the license of any licensee where it is found that the licensee through a violation of G.S. 87, Article 2, has increased the risk of:
>> (1) exposure to carbon monoxide or other harmful vapors . . . .
>
> (g) This Rule is not intended to limit the authority of the Board or the variety of facts for which action is required in a particular situation.
>
> (h) Any of the foregoing actions may result in a probation period or combination of suspension and probation. Condition of probation may include remediation, education, reexamination, record-keeping or other provisions likely to deter future violation or remedy perceived shortcomings.

21 N.C. Admin. Code 50.0412(e) (2016).

The parties agree that we review the interpretation of the applicable statutes

*de novo*.

> The interpretation of a statute is a question of law and thus is reviewed *de novo* in an administrative appeal. But

> because this statute instructs a state agency to promulgate
> regulations to administer it, there is an additional layer of
> review.  If the statutory language is unambiguous and the
> statutory intent clear, this Court must give effect to that
> unambiguous language regardless of the agency's
> interpretation.  But if the statute is silent or ambiguous on
> an issue, this Court must defer to the agency's
> interpretation as long as the agency's interpretation is
> reasonable and based on a permissible construction of the
> statute.

*Total Renal Care of N.C., LLC, v. N.C. Dept. of Health and Human Servs.*, __ N.C.

App. __, __, 776 S.E.2d 322, 326 (2015) (citations and quotation marks omitted).  In

addition, North Carolina common law did not provide for the regulation of the

businesses of installation of heating systems, so these statutes are "in derogation of

the common law and penal in nature."  *Elliott*, 348 N.C. at 235, 498 S.E.2d at 619.

We are therefore required to strictly construe them.  *Id.* ("It is well settled that

statutes which are in derogation of the common law and which are penal in nature

are to be strictly construed.").

In strictly construing these regulatory statutes, our Supreme Court has

directed that we must focus upon "the conduct specifically prohibited" and not upon

the "underlying objectives and general principles" of Article 2 of Chapter 87.  *Id.* at

236, 498 S.E.2d at 620.

> Instead, as noted above, the Court of Appeals focused on
> the policy objectives and general purpose of the Ethics
> Code.
> The Court of Appeals agreed that the Ethics Code

> prohibits sexual relations with clients. However, it noted
> that the Code never suggests that dual relationships of a
> sexual or social nature are permissible after therapy is
> terminated. By focusing on the underlying objectives and
> general principles of the Ethics Code, rather than the
> conduct specifically prohibited, the Court of Appeals erred.
> Accordingly, we reverse the Court of Appeals and hold that
> the Ethics Code must be strictly construed.

*Id.* (citations and quotation marks omitted). Yet we are also not to construe the statutes " 'stintingly . . . to provide less than what their terms would ordinarily be interpreted as providing. Strict construction of statutes requires only that their application be limited to their express terms, as those terms are naturally and ordinarily defined.' " *Id.* at 237, 498 S.E.2d at 620 (quoting *Turlington v. McLeod*, 323 N.C. 591, 594, 374 S.E.2d 394, 397 (1988)).

Winkler argues that the Board has "neither standing nor authority to conduct a hearing or attempt to discipline anyone of any allegation related to anything other than an installation (or contracting to install)." Winkler notes that Article 2 of Chapter 87 "never once uses the word 'inspection' (or 'evaluation' or any similar word or term.)". The Board strenuously argues that "installation" of a system is not required and that Winkler's "incompetence" in failing to recognize the hazards posed by the pool heater and increased risk of exposure to carbon monoxide are sufficient to confer jurisdiction upon the Board. The Board contends that the harm to the occupants of Room 225 in this case was "the precise kind of harm the legislature

intended to bring under the authority of the Board 'in order to protect the public

health, comfort and safety.' " More specifically, the Board contends:

> When, as here, the risk of exposure to carbon monoxide is
> increased by the work of one holding himself out to be a
> heating contractor who lacks the skill and proficiency to
> even ascertain the risk for that harm, regardless of
> whether that risk flowed from repair work on an existing
> system or installation of a new system, the lethal
> consequence of exposure to the carbon monoxide is the
> same. For reason of public safety, the Board therefore
> expressly retains jurisdiction to regulate work involving
> "*any* connection, alteration or repair which if poorly
> performed increases the risk of exposure to carbon
> monoxide."

Although we agree that this is most likely the type of harm which the

Legislature intended to avoid by its regulation of heating contractors, our review is

not based upon the Legislature's intent or general policy concerns. As directed by

*Elliott*, we are guided by "the conduct specifically prohibited" and not upon the

"underlying objectives and general principles." *Id.* at 236, 498 S.E.2d at 620. Thus

we must examine the "conduct specifically prohibited" in this case to see if Winkler's

actions fall within Article 2. *Id.*

As noted above, Winkler does not challenge the Board's findings of fact in this

portion of his argument but only the legal conclusion that his actions in the "service

calls" for the pool heater were actions in violation of Article 2. It is undisputed that

Winkler did not "install" or offer to install the pool heater, as the Findings of Fact

show that the installation had been done -- and very poorly done -- years before. The

Board therefore focuses upon the words "alter" and "restore" as used in N.C. Gen.

Stat. § 87-21(a)(5):

> Any person, firm or corporation, who for a valuable
> consideration, (i) installs, *alters* or *restores*, or offers to
> install, alter or restore, either plumbing, heating group
> number one, or heating group number two, or heating
> group number three . . . shall be deemed and held to be
> engaged in the business of plumbing, heating, or fire
> sprinkler contracting[.]

(Emphasis added).

The Board argues that Winkler " 'restored' " the pool heater on "13 April 2013

when he restored the gas connection to the unit," thereby putting it back into

operation. The Board relies upon the definition of "restore" from the Merriam-

Webster Dictionary, 6th Ed. 2005, " 'to put back into use or service' " or " 'to put or

bring back into a former or original state.' " Essentially, this reading of "restore" is

so broad as to cover simply turning the heater on. Nonetheless, even if the meaning

of "restore" is so broad as to cover the mere act of turning an existing heating system

on, there is no dispute that Winkler is "engaged in the business of" heating

contracting and that he is licensed by the Board to engage in this business. N.C. Gen.

Stat. § 87-21(a)(5). Thus, the question here is whether his actions as to the pool

heater fall within Article 2's authorization of disciplinary action, as it clearly exempts

certain actions. The actions for which the Board may impose discipline are more specifically limited and delineated by N.C. Gen. Stat. § 87-21(c).

Article 2 generally applies to anyone in business as a heating contractor, but N.C. Gen. Stat. § 87-21(c) *exempts* certain acts from "[t]he provisions" of Article 2 of Chapter 87:

> The provisions of this Article shall not apply to those who make minor repairs or minor replacements to an already installed system of plumbing, heating or air conditioning, . . . . Minor repairs or minor replacements within the meaning of this subsection shall include the replacement of parts in an installed system which do not require any change in energy source, fuel type, or routing or sizing of venting or piping. Parts shall include a compressor, coil, contactor, motor, or capacitor.

N.C. Gen. Stat. § 87-21(c).

Thus, the disciplinary provisions of Article 2 do *not* "apply to those who make minor repairs or minor replacements to an already installed system of plumbing, heating or air conditioning." *Id.* The pool heater was installed in 2011 and thus it was an "already installed system," so Winkler's actions are subject to discipline only if they were *more than* "minor repairs" or otherwise included under Article 2's coverage. *Id.* It is undisputed that Winkler did not *replace* any parts of the pool heater or its exhaust system and he did not change the "energy source, fuel type, or routing or sizing of venting or piping" so he did not "repair" the system or "replace" any component of the system as contemplated by N.C. Gen. Stat. § 87-21(c).

Furthermore, even if we take the factual findings as true and Winkler did all
that the Board claims and found he did, none of those actions are actions regulated
by N.C. Gen. Stat. § 87-21(a)(5). At most, the facts would show that Winkler turned
the gas on. This is not enough to constitute an installation, alteration, or restoration
under N.C. Gen. Stat. § 87-21(a)(5). As a practical matter, if we were to read the
statute as the Board requests, a contractor would have to hold the highest level
license before he could even examine or inspect a problem with an existing system to
determine if he is capable of fixing it, since he could be subject to discipline in the
event of any future harm caused by the system even if he did not actually repair it.
There would be no practical use for different levels of licensure by the Board.

The Board, however, argues that Winkler's actions constituted more than
"minor repairs" and thus were covered by Article 2 based upon the regulations
addressing risk of carbon monoxide exposure, so our analysis is still not over. The
applicable regulations further define "minor repairs" or "minor alterations" by
*excluding* from this category "any connection, repair or alteration which if poorly
performed creates risk of . . . exposure to carbon monoxide." 21 N.C. Admin. Code
50.0506. But this regulation first requires that something be *done* to the "already
installed system," N.C. Gen. Stat. § 87-21(c) -- a "connection, repair or alteration." 21
N.C. Admin. Code 50.0506. It also does not cover all connections, repairs or
alterations but only those which "if poorly performed" create a risk of carbon

monoxide exposure. *Id.* But based upon the Board's findings of fact, Winkler did not "repair" the pool heater as defined by N.C. Admin. Code 50.0506, nor did he perform, poorly or otherwise, any "connection, repair or alteration[,]" *id.*, to the "already existing system." N.C. Gen. Stat. § 87-21(c).

At this point, the Board falls back to the "Guidelines on Disciplinary Actions" which provide that "The Board may revoke the license of any licensee where it is found that the licensee through a violation of G.S. 87, Article 2, has increased the risk of: (1) exposure to carbon monoxide or other harmful vapors. . . ." 21 N.C. Admin. Code 50.0412(f). Once again, however, this regulation *first* requires "a violation" of Article 2, which takes us back to the above analysis, which finds Winkler's actions were exempted from Article 2, since Winkler did not replace or repair the already-existing system. Essentially, based upon the Board's findings, Winkler inspected or evaluated the pool heater and its exhaust system, but the words "inspection" and "evaluation" are not included under Article 2. Article 2 addresses installations of systems and non-minor repairs or replacements to existing systems, but it does not cover inspections or evaluations of existing systems, no matter how poorly performed.

The Board's order does not make any findings addressing any connection, repair, or alteration to the existing system which would be covered under Article 2 but relies generally upon the increase of risk of carbon monoxide exposure. Specifically, the Board made the following relevant conclusions of law:

19.     The actions of . . . Winkler and his firm increased the risk of exposure to carbon monoxide for persons in the vicinity of the venting system within the meaning of Board rules 21NCAC.0506, and Board Rule 21NCAC.0412.

20.     The foregoing evidence, particularly Findings of Fact numbers 9, 10, and 16 through 26 establish incompetence and violations of 87-23.

The findings of fact upon which the Board relied in making this conclusion are as follows:

9.     On or about April 13, 2013, Mr. Winkler, doing business as DJ'S Heating Service, was asked by the maintenance staff employed by Appalachian Hospitality Management to *examine* the pool heater and get it running. The maintenance staff was concerned the heater was not functioning or the pilot light would not light.

10.     On or about April 13, 2013, [Winkler] *examined* the heater, and found that the gas supply had been cut off. Along with the Best Western Motel maintenance staff, [Winkler] cut the fuel on, and put the pool heater in operation.   [Winkler] did not examine or inspect the exhaust or venting system for the pool heater at that time, and was not asked to do so.
. . . .

16.     At the time of Mr. Winkler's *examination* of the venting and exhaust system of the pool heater, he was aware that there had been two deaths at that time in Room 225, thought to be from natural causes, and knew that Appalachian Hospitality Maintenance had sufficient concern . . . as to the proper venting of flue gasses to ask [Winkler] to check the systems.

17.     Simple and reasonable *observation* of the pool heater by a heating contractor should cause the contactor to

observe that the pool heater was a natural draft appliance. A heating contractor should know that such a system is required to be vented or exhausted either by a flue extending higher than the roof or by the use of a forced draft system or power venter. In addition, a heating contractor should know that a natural draft appliance draws air from the room as well as exhaust from the flame and discharges both into the flue.

18. Mr. Winkler knew or should have noticed that the room and the humid air in the room containing the pool heater also contained standard pool chemicals, which chemicals were highly corrosive to metal, such as the venting pipes from the pool heater to the exterior of the building, and corrosive air and gasses were being drawn into and through the pool heater and exhaust flue. Evidence of corrosion was visible without the use of any equipment.

19. Mr. Winkler knew or should have known that a vent pipe in such a location was prone to corrosion and that any holes in the flue would result in discharge of dangerous flue gasses inside the Best Western Motel and thereby expose its occupants to the same.

20. In plain sight near the pool heater were a group of wires hanging in the air not connected to the pool heater but terminated with wire nuts. The wires were intended to supply power for a power venter which had been disconnected, likely well before [Winkler's] arrival. Evidence of that disconnection was readily discernible by a minimally appropriate *visual inspection*.

21. During all relevant times, the pool heater was utilizing a side wall to connect the vent pipe to the exterior of the Motel but no power venter was functioning; in addition, the rise of the slope of the flue pipe did not comply with the State Mechanical Code.

22.     [Winkler] also went outside the building to *examine* the terminus of the exhaust vent.  He or one of the maintenance men was able [to] place his hand inside the metal cover over the end of the exhaust and feel warm air coming out when the pool heater was running, and those present discussed that fact.  It was not necessary to remove the cover because it was severely corroded.  The flue gasses exiting the pipe were rising and heat waves in the air were visualized.  A heating contractor should know that the heat should be blowing out, not drifting up, if the power vent was operating properly.

23.     A heating contractor would be placed on notice of the existence of hazardous conditions by *observing* the natural draft appliance, the corrosion visible inside the equipment room and outside at the terminus of the flue pipe, the disconnected wires, the manner in which the exhaust was discharging and the fact there was no vent extending higher than the roof of the building.

24.     As a result of the absence of both a power venter and a flue pipe or exhaust extending above the roof, the exhaust venting system was dependent upon an insufficient natural draft to vent dangerous gasses such as carbon monoxide.

25.     The non-functioning power venter was rated at approximately 75000 BTU capacity while the pool heater which had been substituted at the Best Western had a capacity of 250,000 BTU's as reflected on the equipment label.  Even when functioning, such a power venter was unlikely to exhaust all the harmful gasses.

26.     Mr. Winkler failed to shut the system down, failed to instruct the maintenance staff not to operate it, failed to call the gas company and advise them to shut off the gas, nor replace the power venter and connect the control wiring to the power venter, nor carry out investigation or evaluation of the efficacy of the venting between the ceiling

> of the room where the pool heater was located and the
> exterior of the building. [Winkler] left the pool heater in
> operation, despite the readily observable hazards.

(Emphasis added).

In the next finding, the Board notes that Winkler made "two visual examinations" of the system. Overall, the findings demonstrate that Winkler examined or inspected the system visually. He did not perform any "repair" or "replacement" of parts; instead the Board found that he *failed* to "replace the power venter" and *failed* to "connect the control wiring." Of course, his "failure" to do these things would be consistent with the fact that his license would not allow him to "*replace* the power venter" or to "*connect* the control wiring." At the most, what Winkler did would be commonly called an "evaluation" or "inspection" -- or an "examination" as noted in the findings of fact. We have no doubt that a poorly-done or incompetent evaluation or inspection might fail to discover problems with a heating system which allow exposure to carbon monoxide to continue -- that is exactly what happened here, more than once, and not only by Winkler -- but Article 2 simply does not cover "evaluations" or "inspections" of existing systems. Even if we accept the Board's findings that many of the hazardous features of the pool heater and its exhaust system were clearly visible and should have been obvious to any heating contractor -- despite the fact that neither the inspector for the Town of Boone nor the

licensed gas company which converted the heater to natural gas had ever noticed them -- inspections and evaluations are simply not covered by Article 2.[2]

We do not know *why* the Legislature chose not to include inspections of already-installed systems in the coverage of Article 2, or for that matter why it chose to exclude "minor repairs" and "minor replacements," N.C. Gen. Stat. § 87-21(c), but we are required to strictly construe the statute and to focus on "the conduct specifically prohibited" and not upon the "underlying objectives and general principles." *Elliott*, 348 at 236, 498 S.E.2d at 620. Under that standard, the Board acted beyond its disciplinary jurisdiction by imposing sanctions for Winkler's inspections of the pool heater and exhaust system. To the extent that the Board's order imposed discipline for these actions, it must be vacated.

Winkler has raised three other issues on appeal related to his examination of the pool heater and exhaust system, including whether the Board's findings of fact were supported by substantial evidence and whether the Superior Court properly conducted whole record review, but given our determination that the Board did not have jurisdiction to impose discipline for Winkler's actions as to his examination of the pool heater and exhaust system, we need not address these arguments. Yet we note, however, that the Board also made findings and imposed discipline based upon

---

[2] In fact, only an extensive multidisciplinary evaluation of the hotel building and equipment by many experts after the second incident revealed all of the problems with the system as described by the Board's order.

Winkler's plan to replace the HVAC system for the lobby and breakfast area of the hotel. These actions occurred from 4 June 2013 through 7 June 2013 and are related to the matters discussed above only because they occurred at the same hotel and came to the attention of the Board because of the tragic events of 8 June 2013.

Winkler's brief does not challenge the findings of fact as to the HVAC system and makes no legal argument challenging the Board's conclusion that Winkler was not qualified to install the new HVAC system which had been delivered to the hotel. Winkler simply states that he "knew the limitation of his license, but thought he could do 'like kind' installations since he could service any size system and the Board's law and administrative rules allow for certain like-kind installations." It is essentially undisputed that Winkler was mistaken in his belief that his license qualified him to install the new HVAC system in the hotel because it was a "like kind" installation, and the Board did have jurisdiction to impose discipline for this violation of 21 Admin. Code 50.0403 (2016). But the Board's order found multiple violations by Winkler, and the violations related to the pool heater and exhaust system were the primary focus of the order and the disciplinary measures imposed. We therefore remand the matter to the Board to enter a new order addressing only the disciplinary matters related to the planned installation of the HVAC system in the breakfast and lobby area of the hotel. In the order on remand, the discipline imposed should be based only upon the violations occurring during the period of 4 June 2013 through 7 June

2013, without consideration of the earlier events related to the pool heater or exhaust system. The Board does not have jurisdiction to impose discipline beyond that appropriate to address the violation of 21 N.C. Admin. Code 50.0403 by contracting to install the HVAC system.

IV. Conclusion

Accordingly, while we affirm the Board's finding that Winkler was not qualified to install the HVAC system, we find that the Board lacked jurisdiction to impose discipline regarding his inspection of the pool heater and exhaust system, which was ultimately the primary basis of the disciplinary provisions of the Board's order. We reverse and remand for entry of a new order with sanctions solely based on Winkler's planned installation of the HVAC system.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.

Judges BRYANT and DIETZ concur.